UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JEANNE B. BRYANT, solely in her capacity as court-appointed independent fiduciary for RETIREMENT SECURITY PLAN AND TRUST,<br><br>        Plaintiff,<br><br>        v.<br><br>TAMARACK MUNICIPAL ASSOCIATION, INC., an Idaho corporation,<br><br>        Defendant. | Case No. 1:14-cv-00339-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

The Court has before it Plaintiff Bryant's Motion for Summary Judgment on counts I and II of Bryant's Complaint (Dkt. 24), Bryant's Motion for Summary Judgment on Tamarack Municipal Association's (TMA) counterclaims (Dkt. 45), TMA's Motion for Summary Judgment on all three of Bryant's claims (Dkt. 44), and Bryant's Motion to Strike Expert Testimony (Dkt. 28). The Court has reviewed the briefs submitted by the parties and after a hearing conducted on August 4, 2015 enters the following Order denying Bryant's motions for summary judgment, partially granting and partially denying TMA's Motion for Summary Judgment, and denying Bryant's Motion to Strike Expert Testimony.

# BACKGROUND

Bryant is the court-appointed independent fiduciary for Retirement Security Plan and Trust ("RSPT"). *Compl.* ¶ 1, Dkt. 1. RSPT is the current holder of notes and a mortgage related to the Osprey Meadows Golf Course and portions of the Lodge at Osprey Meadows at the Tamarack Resort (together the "Osprey Meadows Property"). *Id.* ¶¶ 6-52. West Mountain Golf (WMG), who is not a party to this case, is the title holder to the Osprey Meadows Property, as well as the debtor under the notes and mortgage held by RSPT. *Id.*

WMG was unable to maintain or operate the Osprey Meadows Property and consequently leased the property to TMA – the homeowners association of the Tamarack Resort. *Id.* ¶ 20. The initial lease related to portions of the lodge and was signed on July 3, 2009. *Compl.* Ex. E, Dkt. 1-7. The lease was set to renew every 30 days and obligated TMA to pay $100 a week in rent in the form of a credit against past due municipal assessments owed by WMG. *Id.*

On May 1, 2012, WMG and TMA entered into a new lease agreement, in which WMG leased to TMA the golf course and remainder of WMG's lodge parcels.  *Compl.* Ex. F at 2-3, Dkt. 1-8. The terms of this lease called for TMA to operate the golf course at its expense but did not require the payment of any rent. *Id.* at ¶ 3.2. In February 2013, the golf course lease was extended until October 31, 2013. *Aff. of Christensen*, Ex. F, Dkt. 24-3. According to the terms of the extension agreement, however, the lease was set

to renew automatically on October 31 of each year unless either party gave a notice of non-extension no later than the first day of October. *Id.*

It is undisputed that WMG failed to make its payments to RSPT and is now in default under the note and mortgage.  RSPT took the view that, under the assignment of rents provision in the mortgage, WMG's breach gave it authority to unilaterally terminate and/or modify all lease agreements to the property. *Compl.* ¶¶ 41, 83-86, Dkt. 1. Accordingly, on April 28, 2014, RSPT sent a letter to TMA stating that it was terminating the leases. *Compl.* Ex. Q at 1-6, Dkt. 1-11.The letter proposed new lease terms including increasing the yearly rent to $693,500. *Id*. RSPT's letter advised TMA, that if it remained on the Osprey Meadows Property beyond June 1, 2014, that would constitute acceptance of the new terms, including the yearly rent of almost $700,000. *Id.*

In addition to arguing that the Assignment of Rents provision of the mortgage gave it the unilateral right, upon WMG's breach, to terminate all leases to the property, the April 28 letter also contended that it could terminate the lease because TMA had failed to pay the property taxes owed on the Osprey Meadows Property. *Id*. TMA responded on May 9, 2014, contending that RSPT did not have the right to unilaterally terminate the lease, and that the lease did not obligate TMA to pay property taxes and TMA was therefore not in default under the lease.  *Compl.* Ex. R at 1-5, Dkt. 1-11.

In an apparent attempt to hedge its bet, RSPT replied by letter dated May 29, 2014, indicating that if its prior efforts to terminate the lease proved ineffective, it was thereby giving notice of its intent not to renew the lease.  Specifically, the letter stated:

> Lastly, to the extent necessary (and only to the extent a court of competent jurisdiction deems the TMA/WMG lease still operable as of the date of this letter, this letter constitutes notice of non-renewal of the current TMA/WMG lease, as required by paragraph 1 of the Lease and Sublease Extension Agreement between TMA and WMG dated February 28, 2013.

*Compl.* Ex. S at p.1, Dkt. 1-11.  Without any agreement as to whether the lease was or

was not terminated, TMA continued to occupy the Osprey Meadows Property until at

least April 2, 2015 without paying any rent to RSPT. *Aff. of Lord*, Ex. 4, Dkt. 48-4.

Subsequently, Bryant filed this lawsuit against Tamarack for breach of contract for

failing to pay the rent and property taxes as well as for unjust enrichment. Tamarack

responded with counterclaims against Bryant for unpaid municipal assessments and for

unjust enrichment as a result of Tamarack's expenditures to maintain and operate the

Osprey Meadows Property. Bryant has now filed a motion for summary judgment on her

breach of contract claims, a motion for summary judgment on TMA's counterclaims, and

a motion to strike TMA's expert witnesses. TMA has filed a motion for summary

judgment on all three of Bryant's claims.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the

summary judgment "is to isolate and dispose of factually unsupported claims . . . ."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings.  *Id.* at 255.  Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties essentially assert that there are no material factual disputes – does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, the moving party need not introduce any

affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

## ANALYSIS

In 2010, Matthew Hutcheson defrauded the members of RSPT of $3,276,000.00 and used the proceeds of his crime to further his plan to purchase Tamarack resort near Donnelly, Idaho. Hutcheson acquired a mortgage and an assignment of rents encumbering Osprey Meadows Golf Course and a portion of the Lodge at Tamarack. Osprey Meadows was owned by West Mountain Golf, LLC ("WMG").

In unrelated proceedings, Bryant (as trustee for RSPT) later acquired as restitution for Hutcheson's embezzlement of RSPT funds, all of Hutcheson's interest in the promissory note, the mortgage and assignment of rents, so she now holds the position of "Lender" as defined in those documents. Bryant thus has the rights of the Lender, and nothing more. This is not just a question of what the parties to the mortgage agreed upon. It is also a question of what notice was given to an innocent third party entering into a lease on the property. A party entering into a lease on the property would not have

understood the language of the mortgage and assignment giving the mortgagee (Bryant) an unfettered right to terminate the lease without complying with the limitations contained in the lease – i.e., giving at least a 30-day notice of non-renewal before the end of the lease. Dkt. 1, Ex. A.

Additionally, the modification to the lease also gives Bryant, as the Landlord, the right to "terminate this Agreement in the event that . . . [TMA] breaches any material term of this Agreement and fails to cure such breach within fifteen (15) days after receiving written notice from Landlord of the breach." Dkt. 1, Ex. F at 10.

Bryant argues that she had the right to terminate the lease, on behalf of RSTP, on three alternative theories: (1) The April 28 letter constituted an exercise of her absolute right to terminate the lease pursuant to the assignment of rents provisions in the mortgage; (2) TMA was in default for failing to pay real estate taxes on the property; and (3) The May 29 letter satisfied the thirty day notice requirement for not renewing the lease.  As explained below, Bryant is only correct with regard to the 30-day notice of non-renewal.

### 1.  Unilateral Termination Breach of Contract Claim (Holdover Lease) Count I.

First, Bryant claims she unilaterally terminated the lease and imposed new lease terms on TMA as a holdover lessee. But Bryant had no right to unilaterally terminate the lease because no such right existed in the original lease assigned to her. TMA obtained rights under its lease from WMG.  Those rights were not affected by an independent agreement that WMG may have reached with Bryant's predecessors-in-interest who

negotiated the terms of the note, mortgage and assignment of rents.  Those documents do

provide that upon WMG's default, Bryant, as lender, may,

> assume all rights of the landlord under the Leases, may operate and manage
> the property, enter into and enforce the Leases, terminate the Leases and
> take any or all actions Lender deems prudent to preserve its rights to the
> Rents and Leases and collect amounts owing to it.

*Compl.*, Ex. B at p.2, Dkt. 1-4. However, the only reasonable construction of this

language is that Bryant, upon WMG's default, would have only those rights which WMG

possessed to terminate any leases of the mortgaged property.  Nothing in this clause

suggests that Bryant received the right to unilaterally terminate all existing leases,

regardless of the rights of the tenants. Accordingly, the Court will grant summary

judgment for TMA on Count I.

## 2.  Bryant's Property Tax Claim (Count II).

Bryant next claims that TMA breached its lease agreement with WMG by failing

to pay the property taxes on the golf course. Thus, Bryant claims that she had the right to

terminate the lease pursuant to the modification to the lease stating that the "Landlord has

the right to terminate this Agreement in the event that . . . [TMA] breaches any material

term of this Agreement and fails to cure such breach within fifteen (15) days after

receiving written notice from Landlord of the breach." Dkt. 1, Ex. F at 10. TMA counters

that the terms of the lease do not require it to pay any property taxes and that, even if the

language is ambiguous, the only evidence in the record is that the lease did not require

TMA to pay the property taxes. The Court agrees that the language is ambiguous, but

concludes that TMA's extrinsic evidence is so persuasive that no reasonable jury could disagree with TMA's interpretation.

The determination of whether a contract is ambiguous is a question of law that is ascertained through the court's analysis of whether the contract is reasonably subject to conflicting interpretations. *Williams v. Computer Resources, Inc.*, 851 P.2d 967, 969 (Idaho 1993). Only if the contract is found to be ambiguous may extrinsic evidence be considered in order to discern the true intent of the parties. *Bilow v. Preco, Inc.*, 966 P.2d 23, 27 (Idaho 1998).

TMA was "solely responsible for all costs associated with its operation of the Golf Course and Lodge and any other activities in which [TMA] engage[d] on the Property." *Compl.* Ex. F at Art. 4.4. Bryant argues that, in a commercial setting, the term "operating expenses" often includes the payment of property taxes. However, the contract language could also mean that TMA was only responsible for costs that arose as a direct result of the operation of the property. Property taxes would have been assessed even if TMA did not operate the golf course or engage in any activities on the property. Thus, this interpretation would not require TMA to pay the property taxes. Therefore, the language is ambiguous because it is subject to two reasonable interpretations that directly conflict.

TMA has presented uncontradicted and persuasive extrinsic evidence showing that WMG and TMA did not intend for TMA to pay the property taxes. Specifically, TMA offers the affidavit of WMG's managing member, Randy Hopkins. Hopkins attests that WMG never intended for TMA to pay the property taxes on the Osprey Meadows

Property. *Hopkins Aff.*, ¶¶ 10, 19, Dkt. 30-3. Presented with Hopkins' affidavit and no other evidence of intent, it would be impossible for a reasonable jury to conclude that WMG and TMA intended the term "operating expenses" to include the payment of property taxes.

Bryant also contends that TMA was obligated to pay the property taxes since TMA was required to "discharge at its expense any lien…resulting from [TMA's] use of or activities on the Property." *Compl.* Ex. F, Art. 10, Dkt. 1-8. Bryant alleges that failure to pay taxes on the Osprey Meadows Property resulted in a tax lien. *Compl.* ¶ 65. However, the lease unambiguously did not require TMA to discharge the lien because the property taxes did not result from TMA's use of or activities on the property. Rather, taxes would have been assessed and the lien imposed even if the property was dormant. Therefore, the Court will grant summary judgment on this claim as well. Accordingly, the Court will grant summary judgment for TMA on Count II.

### 3. Bryant's Unjust Enrichment Claim (Count III).

Finally, Bryant contends that it terminated the lease by giving at least 30 days' notice that the lease would not renew. Bryant is correct. In a May 29, 2014 letter, Bryant indicated that "this letter constitutes notice of non-renewal of the current TMA/WMG lease, as required by paragraph 1 of the Lease and Sublease Extension Agreement between TMA and WMG . . . ." *Comp.* Ex. S, Dkt. 1-11. Thus, the lease was terminated as of October 31, 2014, and Bryant may pursue a claim for unjust enrichment for any damages from TMA after that date.

"The essence of the quasi-contractual theory of unjust enrichment is that the defendant has received a benefit which [it] would be inequitable to retain at least without compensating the plaintiff to the extent that retention is unjust." *Beco Const. Co. v. Bannock Paving Co.*, 797 P.2d 863, 866 (Idaho 1990) (Quoting *Hertz v. Fiscus*, 567 P.2d 1 (Idaho 1977)). Bryant claims that TMA has been unjustly enriched both before and after she allegedly terminated the leases. Since the leases were contained in express contracts, Bryant cannot now claim that the leases unjustly enriched TMA. "We will not rescue a contracting party from the consequences of what later appears to be a bad bargain." *Christensen Motor Sales, Inc. v. Am. Motor Sales, Inc.,* 697 P.2d 442, 445 (Idaho 1985). However, Bryant may have a valid claim of unjust enrichment if TMA received a benefit by holding over after the leases were terminated.

There is a genuine dispute regarding the amount of benefit conferred to TMA. TMA presents evidence that the rental value of the Osprey Meadows Property is $0 and, therefore, that TMA did not receive any benefit. In response, Bryant contends that TMA enjoys benefits beyond mere profits from the golf course because of the course's association with the Tamarack Resort. There appears to be adequate evidence on both sides of this argument to persuade a reasonable jury and, therefore, there is a genuine dispute of material fact regarding Bryant's unjust enrichment claim. Accordingly, the Court will deny both Bryant's and TMA's motions for summary judgment on Bryant's unjust enrichment claim.  That claim will need to be resolved by a jury.

**4. TMA's Unjust Enrichment Claim.**

TMA filed a counterclaim for unjust enrichment against RSPT. In order to prove that RSPT was unjustly enriched, TMA must show that 1) a benefit was conferred on RSPT by TMA, 2) RSPT appreciated the benefit, and 3) it would be inequitable for RSPT to accept the benefit without paying for the value of the benefit. *Gibson v. Ada County*, 133 P.3d 1211, 1224 (Idaho 2006). The party receiving the benefit must actually appreciate the benefit. As a result, unjust enrichment will not apply in the case of a mere volunteer who, without request, confers a benefit upon another. *Teton Peaks Inv. Co., LLC v. Ohme*, 195 P.3d 1207, 1211 (Idaho 2008). "This rule exists to protect persons who have had unsolicited 'benefits' thrust upon them." *Id*.

There is sufficient evidence in the record for a jury to conclude that RSPT received a benefit from TMA. TMA claims that it conferred a benefit on RSPT by partially paying RSPT's assessments levied by the Lodge at Osprey Meadows (LOMA) and by maintaining and improving the Osprey Meadows Property beyond the requirements of the leases. RSPT has the right to lease the property but any lessee would be liable for the LOMA assessments. *See Aff. of Christensen*, Ex. A, Article 7.5, Dkt. 45-4. As a result, paying the LOMA assessments will allow RSPT to possibly obtain a higher rental price for the property. In addition, the assessments are used to benefit the lodge and, therefore, presumably benefit those who own or have an interest in property within the lodge. *See Aff. of Christensen*, Ex. A, Art. 7.2, Dkt. 45-4. Thus, there is sufficient evidence for a jury to conclude that TMA conferred a benefit on RSPT.

There is significant evidence that RSPT appreciated the benefit conferred by TMA. As discussed previously, the intent of the parties is irrelevant in determining whether or not a quasi-contract exists. *See Cont'l Forest Products, Inc.*, 518 P.2d at 1205. Therefore, no intent to receive the benefit is necessary. Rather, a receiving party appreciates the benefit if it understood that it was receiving the benefit from the conferring party for free. *See* Black's Law Dictionary (10th ed. 2014) (Defining "appreciate" as "to understand the significance or meaning of"). In 2013, TMA notified RSPT that it was expending significant sums of money to protect WMG's assets and it does not appear that RSPT objected. *Compl.* Ex. H, Dkt. 1-10. This alone is sufficient evidence to persuade a reasonable jury that RSPT knew it was receiving a benefit for free.

Whether or not it would be inequitable for RSPT to accept the benefit without payment is a question for a jury to answer. Deciding questions of equity intrinsically requires the exercise of moral judgment and often requires considering the facts of a case in the aggregate. In other words, nearly all facts are material facts when deciding questions of equity. Absent exceedingly clear evidence that the balance of equities tips in one party's favor, it would be improper for the Court to replace its judgment for that of the jury. At a minimum, there are genuine disputes about the value of the benefit conferred and about whether or not the benefit was a mere byproduct of TMA acting in its own self-interest. These disputes are sufficient to deny summary judgment because their resolution will likely affect whether or not a jury finds RSPT's non-payment

inequitable. Accordingly, the Court will deny summary judgment on TMA's unjust enrichment counterclaim.

### 5. Unpaid Municipal Assessments Claim.

TMA's second counterclaim argues that RSPT is liable to it for unpaid Municipal Assessments. RSPT asks for summary judgment on that claim. Given the facts in the record, a reasonable jury could conclude that RSPT is liable to TMA for municipal assessments.

Under the Tamarack Resort Association bylaws, mortgagees are not liable for municipal assessments but assigns are liable. *Aff. of Lord*, Ex. 1, ¶ 4.5, Dkt. 25-2. RSPT is certainly a mortgagee, however, RSPT has been assigned certain property interests beyond those of a traditional mortgagee as a result of the assignment of rents. *Compl.* Ex. B at 1-5, Dkt. 1-4. The bylaws do not appear to indicate whether or not a mortgagee may also be an assign. Therefore, there is sufficient evidence for a reasonable jury to conclude that RSPT is an assign and, consequently, liable for any assessments owed on the Osprey Meadows Property.

TMA has the authority to levy municipal assessments on "units" as the term is defined in the General Declaration for Tamarack Resort. *Aff. of Lord*, Ex. 1, ¶ 4.1, Dkt. 25-2. "Units" do not include "the Club Facilities and the Mountain Facilities, exclusive of any parcel which would otherwise be associated with a Class A Residential Membership or a Class B Village Membership; [or] Association Facilities." *Id*. ¶ 2.42. The portion of the Osprey Meadows Property within the lodge appears to be part of the Club Facilities.

*See Id.* ¶¶ 2.4 and 12.1. In addition, any parcels leased by TMA are classified as Association Facilities during the duration of the lease. *Id.* ¶ 2.9. Therefore, in order for TMA to levy assessments on WMG's lodge parcels, the parcels must be 1) associated with a Class A or Class B Membership and 2) not under lease to TMA.

TMA has presented evidence that WMG's lodge parcels are associated with a Class B Village Membership. All owners of units within the Village are Class B Village Members. *Aff. of Lord*, Ex. 2 ¶ 3.1(a)(ii)(1), Dkt. 25-3. The Village is "[t]hat portion of Tamarack Resort which is delineated in a Final Plat for the PUD, or in any Supplemental Declaration, as 'the Village.'" *Aff. of Lord*, Ex. 1 at ¶ 2.43, Dkt. 25-2. The Condominium Plat for Tamarack Resort Members Lodge identifies WMG's parcels as being units within the Village. *Aff. Of Lord*, Ex. 1, pp. 6-10, Dkt. 48-4. Therefore, a reasonable jury could conclude that WMG's parcels are units associated with a Class B Village Membership.

WMG's parcels have not always been under lease to TMA. The record indicates that TMA leased four of WMG's 11 lodge parcels in the 2009 lodge lease, *Aff. of Christensen*, Ex. E at 1-7, Dkt. 24-3, and the remaining seven parcels in the 2012 golf lease, *Aff. of Christensen*, Ex. F at 2-3, Dkt. 24-3. Since TMA was precluded from levying assessments on WMG's parcels while they were under lease to TMA, there remains a genuine dispute regarding the amount of assessments owed by WMG to TMA. Accordingly, the Court will deny summary judgment on TMA's Municipal Assessments counterclaim.

**6. Motion to Strike.**

The well-known standard for admitting expert testimony is set forth in Rule 702 of the Federal Rules of Evidence. One requirement is that the evidence offered by the expert must assist the trier of fact either to understand the evidence or to determine a fact in issue. *Primiano v. Cook*, 598 F.3d 558, 563 (9th cir.2010); Fed.R.Evid. 702. "The requirement that the opinion testimony assist the trier of fact goes primarily to relevance." Id. at 564.

Bryant argues that expert testimony regarding the market rental value of the Osprey Meadows Property is irrelevant.  The Court disagrees.  As discussed above, Bryant is entitled to pursue a claim of unjust enrichment for the time TMA occupied the Osprey Meadows Property after November 1, 2014. In order to prove unjust enrichment, Bryant must prove that a benefit was conferred on TMA. *Gibson v. Ada County*, 133 P.3d 1211, 1224 (Idaho 2006). Presumably TMA has obtained their expert in order to provide evidence that there was no benefit or that the benefit was very small. Such evidence is not only relevant but almost necessary to determine any award of damages. Therefore, Bryant's Motion to Strike must be denied.

In the alternative, Bryant requests additional time to retain a rebuttal expert. Bryant's deadline for disclosing rebuttal experts was March 20, 2015 and she filed her Motion to Strike on March 19, 2015. The Court is not in the habit of allowing parties to circumvent established disclosure deadlines by filing motions to extend. In addition, Bryant should have been well aware that the value of the Osprey Meadows Property

would be in dispute since she herself made a claim of unjust enrichment. Therefore, the Court will deny Bryant's alternative motion to extend the disclosure deadline.

**ORDER**

**IT IS ORDERED:**

1. Bryant's Motion for Summary Judgment (Dkt. 24) is **DENIED.**

2. Bryant's Motion to Strike Expert Testimony (Dkt. 28) is **DENIED**.

3. TMA's Motion for Summary Judgment (Dkt. 44) is **GRANTED** in part and **DENIED** in part as explained above. The claim for unjust enrichment remains.

4. Bryant's Motion for Summary Judgment (Dkt. 45) is **DENIED**.

DATED: September 30, 2015

B. Lynn Winmill
Chief Judge
United States District Court